Well briefed and we'll take it under advisement. Call our next case for the morning, Neil Crispin v. Commissioner of Internal Revenue. Good morning, Your Honors, and may it please the Court. My name is George Connolly. I am counsel... I'm sorry. I'm sorry. I'll wait just one minute until we clear off the last argument and get settled. I apologize, Your Honor, for being so hasty. Once again, good morning. My name is George Connolly. I represent the appellate, Neil Crispin, in this proceeding, and I'd like to reserve three minutes for rebuttal at the conclusion of our comments. Grant. May it please the Court. This matter involves something called a custom adjustable rate debt structure, which has been the subject of other cases. As we've explained in our briefs, there are significant factual differences between Mr. Crispin's experience and the other reported cases. We're here because, quite frankly, the tax court has said, we decided other cards cases against the taxpayers, and as a result, we don't believe we ever got a fair consideration of our evidence with respect to Mr. Crispin's business purpose, profit potential, or anything else in the case. Let me say you don't think you ever got a fair hearing. You had a chance to put on evidence in front of the tax court. The tax court, and I don't think he's truthful. I think he never really intended to have aircraft be substituted collateral here, even if that could have happened, so I'm discounting that. Now, why isn't that classically the responsibility of a trial tribunal, and something that isn't for us to intermeddle with? Partly, Your Honor, because of evidence we were not allowed to I don't understand your argument on that. Boyle claimed the fifth. You alluded to an adverse inference against the government for intimidation. There's no evidence in the record of that. I mean, how can you get around Boyle's testimony, whatever it may have been, when Boyle wouldn't testify? Judge Fisher, I believe that the papers filed by Boyle's lawyers in response to our subpoena indicate that he is part of an ongoing investigation by the Southern District of New York U.S. Attorney's Office relating to alleged tax shelters, and as a result, was not going to put himself on the stand. Our point, very simply, is this. Judge Jordan's correct. Our testimony was rejected, but it was rejected as uncorroborated. Our contention is if Mr. Boyle had testified, he could have corroborated every important point that Mr. Crispin made, and we believe most of the cases that have come down in this area involve criminal proceedings where we can point to a prosecutor or an agent who goes to a witness and says, if you testify, we'll do thus and so. We don't have that. We have a more general threat to Mr. Boyle. We couldn't put his testimony on the stand. You have the government doing what the government's supposed to do. How can that lead to an adverse influence? The government's supposed to investigate suspected criminal activity. Evidently, that's what they're doing. Mr. Boyle chooses to invoke the Fifth Amendment. How can you turn that into a basis to say, in your case, we should win because somebody invoked the Fifth? Your Honor, it's very simply the fact that the government, the United States government, and its threat to Mr. Boyle by virtue of potential prosecution prevented us from putting him on. But that happens. I mean, that happens that people are under investigation and therefore aren't willing to testify. What should have happened here? The government should have been barred from investigating him so that he wouldn't take the Fifth? Absolutely not, Judge Rundell. One of two things. Number one, I think the Internal Revenue Service should have gone to the United States Attorney's Office and said, hey, we are facing an adverse influence. If Boyle doesn't testify here, release him from any potential threat of prosecution for purposes of his testimony here, like a limited immunity grant. Was there any request for that by your client in the tax court? Was there a motion to seize him, to compel him to immunity, anything like that? Your Honor, we frankly felt that by subpoenaing Mr. Boyle and arguing that he should be brought in to testify, we had basically done everything we could and everything we were required to when the tax court made its declaration, okay, he's unavailable. But what order of the tax court with respect to this are you asking us to reverse? I'm not asking you to reverse an order of the tax court per se. What I'm asking you to do is what the Eastern District of New York did in the Ramirez case, Your Honor, which is to draw a negative inference against the United States, here the Commissioner of Justice deemed his testimony, deemed Mr. Crispin's testimony as corroborated by Mr. Hahn and others as would have been corroborated by Mr. Boyle if he had been allowed to testify. If we agreed with that, could we do that or should we be required to send it back to the tax court directing them to refine the facts based on the adverse inference? I'm asking you to send it back to the tax court to do exactly that, Judge Fischer. Now, are you saying you asked the tax court to draw an adverse inference and they refused? What I'm saying is we made a presentation indicating what Mr. Boyle's testimony would have been and the tax court chose not to accept it. All right, but you did not, they did not, the order of the court was not to deny such a request for an adverse inference, correct? That's correct, Your Honor. More specifically, was there ever a request to the tax court for an adverse inference? In all honesty, Judge Jordan, no, there was no specific request. Well, that's kind of significant, isn't it? It may be significant, Your Honor, but remember, there were two parts to the Boyle issue here. We wanted to put Boyle on, we weren't allowed to. We had a former business associate of Mr. Boyle, Larry Austin, and we identified in pretrial documents that if Boyle didn't testify, we wanted to put Austin on to talk about basically the way the operation was conducted as well as conversations he had had with Boyle. Judge Kropa refused to let us have that testimony of Mr. Austin. Well, is that order in the record? I believe it is part of the appendix, Your Honor, it was in the transcript of it. It wasn't something that Judge Kropa issued a specific order with respect to as she did in granting the quashing of the subpoena. Let's assume for the sake of discussion that we weren't inclined to agree with you that some adverse inference was in order here and that what we're dealing with is Mr. Crispin's testimony on the stand, which the judge found incredible. I don't know if she said incredible, Judge Jordan, she just didn't accept it. Didn't accept it? Yes. Not credible. Not credible enough to be credited. If that's the state of the record as we understand it. I'll go back to the question I asked you earlier. Why isn't that the classic sort of fact-finding which would only be overturned if it was credited? Well, it is exactly that kind of fact-finding, Judge Jordan, and that's what we've argued in our briefs. We believe if you look at the record as a whole, it was clearly erroneous for her to come to that conclusion. But we're backstopping with the fact that if we could have had Boyle's testimony, we could have corroborated every item that she said was not corroborated. Explain to me, leaving the Boyle piece out of it, what's clearly erroneous about not believing a witness' testimony? I don't think there was anything inherently incredible. There was nothing impeached. I don't think a judge can simply say, well, the testimony is self-serving and uncorroborated, and therefore we're not going to accept it. I think you have a totality of evidence ranging from the documentary evidence, the testimony of Mr. Crispin, testimony of Mr. Hahn, other third parties which supported his testimony. What was, excuse me if I'm interrupting, but what was the evidence in the record, separate and apart from Mr. Crispin's testimony, that pointed out that this was an actual aircraft transaction, that this was going to be a business of aircraft leasing? What is there in the record? Well, above all, Judge Rundell, it has to do with how he came involved with cards in the first place. He was approached by Roy Hahn, who had what I'll call a busted deal. Roy said, Neil, I've known you for years. You're always looking for financing. I know you've been involved in aircraft. In fact, I consulted with you years ago when I had a potential cards customer who wanted this up to business. But I'm asking a pretty pointed question. Where in the record do we see page 492, this is an aircraft financing deal, these are my projections, this is what I'm going to be doing, I have a game plan for a 30-year loan, et cetera, et cetera? Well, that is, it is throughout Mr. Crispin's testimony, the desire to use aircraft is something that was corroborated by two people, Mr. Hahn and Rob Morris, the attorney who did the tax opinion, based on conversations with Mr. Crispin and a review of all the documents. It wasn't in the letter, the tax letter, did not talk about the aircraft. Excellent point, Judge Fischer. The tax letter talked about equipment financing. But at trial, Mr. Morris testified, unlike a lot of tax lawyers, he sat right on the witness stand, he looked Judge Croak in the eye and said, I knew that what Mr. Crispin was using in this court was aircraft leasing. Doesn't it run in the face of the actual documentation? I mean, didn't Desert Bank have the right to bring that loan in after a year, as they in fact did? Judge Jordan, of course it did. So can you point me to a circumstance where somebody finances aircraft on a loan that's callable within a year and which in fact is set up to be callable in a year in accordance with other cards transactions that Mr. Hahn would generate set up for a variety of other people? Believe it or not, Judge Jordan, you've asked about five questions in one. Let's go to the Hahn. He said that at other banks, like Deutsche Bank, he had cards deal where 40% of them went beyond one year and several went five to six. Other cards deal, the Gustashow case and the Kerman case, which were other decided cases here, involved Hypo Varyant Bank, which admitted in the deferred prosecution agreement, this thing was never supposed to go more than a year. There is no such evidence in the record with respect to Zurich Bank. All the documents in the record indicate a 30-year loan and- No, no, no. Stop, stop. When you say all the documents in the record indicate a 30-year loan, don't the documents indicate indeed that this was callable in a year? Sure they do. Sure they do, but- How can you say all the documents show that this was a 30-year loan? This was a loan that was callable in a year and the cards transaction presented at the get-go made that clear, didn't it? The cards transaction presented the fact that there was an annual reset date at which the bank could choose not to continue the loan. But let's face it, Judge Jordan, banks are in the business of making money. And if Mr. Christman had a good business deal to present to the bank, at that reset date, the bank surely would have accepted it. But he never presented them originally with an aircraft deal. Because the aircraft were not going to be available until the end of 2002. Secondly, Mr. Boyle said to him, don't bother with a business plan or anything like that until next summer. You know, you set up Boyle as a straw man here that you couldn't use, but Boyle wasn't even the person in authority that could have given him that assurance, was he? He was the relationship manager at Zurich Capital Markets. And the fact of the matter is he was the face of it. He was the guy who was supposed to go out and get business for Zurich Bank. He was the guy who could have testified, here's my authority. Here's what the basis is. Here's what they told me to go out and do. We were prevented from putting all of that in to provide background for what Mr. Christman did. Could you address the penalty provision? The gross valuation misstatement? I'd love to, Your Honor. And we'll give you an extra two minutes. I just want to hear your take on this. Very simple, Your Honor. We believe the penalty is focused on an actual valuation misstatement, not simply the lack of economic substance. In the internal, and here it's an alleged inflated basis. In the Internal Revenue Code, there are only two places where basis and cost are the same. Or rather, basis is always cost. There are only two places where it isn't. When you inherit property from somebody, you receive it as a gift, you take it as fair market value. Or, if you're a dealer in securities, there are the mark-to-market rules. Otherwise, basis is defined as cost, cash plus debt. The basis here was, in fact, the cash Mr. Christman put in and the liability he assumed with respect to the Swiss francs he acquired. One very important point, Your Honor, is the tax court never decided basis. In fact, the government filed a motion for summary judgment to the effect that we had no basis. Judge Kropa denied it. And I hate to sound sarcastic or facetious, the fact of the matter is, if she had decided we didn't have any basis here, we'd never be talking about economic substance. But when there's a lack of economic substance, doesn't the case law pretty much say that the basis is zero in this type of transaction? There are opinions of not only the tax court, but all the courts of appeals except the Fifth and the Ninth, which say that. I'm going on the Marino opinion issued by this court, which has language to that effect, but also contains very specific findings that in the court below the taxpayer stipulated that the basis was way down here. So you would want us to send this back for determination as to the basis? Absolutely. To the tax court? Absolutely. But the tax court affirmed the penalty. But the tax court never decided basis, Your Honor. No, but they had to, by inference, by implication, have bought into exactly what the commissioner said, which is that it's zero because of the dollars, don't they? The tax court said, no economic substance, therefore, the valuation probably applies. We don't believe that's a proper rule of law. Tax court never got into basis, ever once in a while. Isn't it implicit that they followed, in essence, what Gustafshaw said, which is, if there's no economic substance, your basis is zero? They've decided all four of the cards cases with exactly that language, Judge Horton. But please remember something. In Gustafshaw, there was never a contest with respect to economic substance or basis. The only thing Gustafshaw argued about was whether the penalty was applicable, whether he had reasonable cause and good faith. Sure, but if we follow it, if we said Gustafshaw seems well-reasoned, doesn't the reasoning of Gustafshaw carry through and support just what the tax court did? The tax court says there's no substance here. Gustafshaw says what seems implicit in the tax court decision, which is basis is zero, therefore, your claim to deduction is... I think you have to decide all the other issues that are presented here against us to take that position in Gustafshaw, simply because Gustafshaw never contested the other issues. He said, Judge, we lose. We lose on all the other issues. We lose on basis, economic substance. But in effect, my heart was pure. Please don't hit me with the penalty. Your Honor, thank you very much. All right, we'll hear from you on rebuttal. Thank you. Good morning, may it please the court. Judith Hagley from the Justice Department, representing the Commissioner of Internal Revenue. There have been five other cards cases addressed by the tax court, and in each, the court upheld the Commissioner's determination that the transaction lacks economic substance, and where penalties were imposed, that the valuation of the statement penalty applied. The court reached the same conclusion here, but only after analyzing the facts specific to Mr. Crispin's case. Do you want to address what Mr. Connolly said there at the end? The tax court never addressed the issue of basis, and therefore, the penalty issue was wrongly dealt with in the tax court, and it has to go back. What's your response? Well, we think this, we disagree, and we think this court should follow what the Levin Circuit did in Gustafsha, and what the tax court found in this case is it found two things. Number one, that the entire cards transaction should be disregarded for tax purposes, and when you disregard a transaction, any property acquired in that transaction's basis is zero, and the court also found on page 30 of the appendix is that when the correct basis is zero, and of course, they assumed that the correct basis was zero. Well, wait, how do you assume that? Because it follows naturally from the fact that the court, that the transaction has been disregarded for tax purposes, which the court had earlier found on page 28 and 29 of the appendix, and so as the court stated, citing the Treasury regulation, is that when the correct basis is zero, the claim basis is deemed to be 400 percent or more than the correct basis in the valuation of the statement of penalty applied. That was the analysis applied by the Levin Circuit in Gustafsha, and it should be the same analysis that we think this court should follow here. Now, is that required that it's zero? I know some of the case law says that, but there's nothing in the tax code that says when there's lack of economic substance, it's concluded that someone paid absolutely nothing, is it? It doesn't say that in the tax code, but the economic substance doctrine has been developed by the courts, including this court. One of its primary decisions is the ACM decision, and it's well established that when a transaction, or rather, let me flip it, to be respected for tax purposes, a transaction must have economic substance. Right, so based on that, you totally undo it, and you recalculate what they owe. Exactly. But then the penalty provision seems to be when someone has engaged in a transaction, and they're saying the basis is this, and the correct basis really is something else, it just seems under the language of the code that that applies to a real actual transaction, not to a sham. What is, well, but there are seven circuits now, including this court in Rio decision, that have held that the valuation in the statement penalty applies when a transaction has been disregarded in the economic substance doctrine. I'm just not sure, I know you talked about intent, I'm not sure that's congressional intent, but. Well, what Congress is looking for is, what was your claim basis, what is your correct basis? And if there's a difference there, and it results in a tax deficiency, then the penalty applies. And what Congress was trying to do was to penalize attempts to create artificial losses, either by inflating value or inflating basis. So I think it's perfectly with Congress's intent, congressional intent, that a shelter that's trying to create a tax benefit that's not hundreds of thousands, but millions of dollars of artificial loss would be subject to this penalty. The tax court didn't specifically say, the basis is zero, and therefore, et cetera, et cetera. It actually said it lacks economic substance without regard to value. Whatever its basis, and that was the same, I think, result in the Marino case. The parties there had stipulated that the basis of the property was $50,000, and the taxpayer didn't get a $50,000 tax benefit, no benefit. But then there was an actual piece of property where they said it's worth X, XY. Here, we don't have that. We have a transaction. We have something that is basically a shell game. But we do have actual property, because the property that generated the claim loss was the foreign currency, the Swiss currency, the Swiss franc, sorry. And the way the taxpayer claimed the benefit was on its tax return reported that its basis in the Swiss currency was $9.4 million. It exchanged it the same day it acquired it for $1.8 million, which was the property's value, and lo and behold, a $7.6 million artificial loss. So that was a wash transaction. $1.8 million of foreign currency was acquired in exchange for $108 million. But was $1.8 its basis? No, that's what it acquired. What was its cost? If you were to respect the transaction, the actual cost for it was $1.8 million. It's fair market value when it was acquired, and then it was exchanged the same day for $1.8 million. But because the transaction does not have any economic substance, that currency acquisition is not respected. Taxpayer has no basis in that property. Don't you end up in the same place, though? You do, exactly. You end up exactly. You look at it as a basis of $1.8, you claim $9.4, or you look at it as it's a sham and it's zero. You still end up with $7.6 and... That's exactly right. Is that right? That is exactly right. That is exactly right. The taxpayer has not addressed the reasonable cause argument. We've addressed that in our brief. If the court has any questions on that, I'd be happy to address it. We want to talk, if you would, about Mr. Boyle and adverse inferences, et cetera. Sure. As I believe as Judge Fisher noted, there was no evidence of witness intimidation in this case. Mr. Boyle decided for personal reasons to claim the Fifth Amendment. His attorney put in his motion that Mr. Boyle was doing this for personal reasons, that there should be no adverse inference against the government, and the parties in this case really didn't address that issue as counsel for Mr. Crispin admitted. They never asked the court for an adverse inference, but as the tax court found, even if Mr. Boyle had testified and had made the statements that Mr. Crispin claimed, it wouldn't change the outcome of the case because even if Mr. Boyle had made the statement that Zurich Bank would consider looking at aircraft and that Mr. Boyle should... I'm sorry, Mr. Crispin should hold off putting together that credit package till June of 2002, Mr. Crispin didn't put that package together. And so as the tax court found, it's not just that Mr. Crispin's testimony was uncooperated, it's that Mr. Crispin's testimony conflicted with his own actions. He never put together a credit package for Zurich Bank. He conceded on the stand that Mr. Boyle did not have the authority to deem what type of property would be acceptable collateral, and therefore, even if Mr. Boyle had made these statements, Mr. Crispin could not reasonably rely on them. But one of the things that Mr. Crispin argues is that at least as to his unimpeached testimony, he testified that he intended to use the card loans to fund aircraft. He did testify to that, but that was inconsistent with his... But the tax court ignored that. The tax court found that it wasn't credible. But it wasn't impeached. It was impeached by his own actions, Your Honor, because he entered into the transaction without first establishing with Zurich Bank what they would accept. And he conceded that in a non-cards loan, what you do first is establish with the bank what would be acceptable collateral. That's not what he did here. What he first established was with Chinnery how much income Muris was going to earn in 2001, and that was $7.6 million of income. And then if you look at Chinnery's documents that we've cited in the record, they note in their internal documents that Mr. Crispin wants a $7.6 million loss. There's no analysis in that document of how much financing that he may or may not want from Zurich Bank. And then the card transaction was designed to generate the $7.6 million loss that exactly offset the income earned in this case. So one of the other things that Mr. Crispin points out is that this transaction wasn't designed specifically for him. It was designed for somebody else, and he picked it up. I mean, doesn't that also... He picked it up for the tax benefits. That's right, and he shared... Doesn't that also factor into the question of whether or not he had the intention of picking this up for purposes, as he said, to facilitate liquidity for his aircraft business? I don't think that it does. It was one fact in the case, but it's undermined by the fact that he never pursued the financing that he engaged in this transaction without any sort of written business plan or profitability of analysis that would demonstrate that he was going to take Neurist, which had been a mortgage security company, and transition it over to an aircraft leasing company. So, do we have any further questions? Thank you. Rest of our brief. Thank you very much for your time. Mr. Connolly? Thank you, Your Honor. I speak rapidly. I hope I can cover all this in three minutes. First point, Ms. Hagley says there were five other cases. I have known of only three, Country Pine, Kerman, and Gustafshaw. There are four opinions total, but only three other cases. And as I mentioned, Hypovariance Bank was involved in two of them. They did a non-prosecution agreement saying this was a sham. We don't have what's there. Secondly, with respect to the valuation penalty, we get the congressional attempt. Why would they call it a valuation misstatement if that part of the penalty is based about anything except real valuation? I don't think they can. I'll stop there for just a moment. To accept that position, Mr. Connolly, wouldn't we have to accept that Congress intended for people who make mistakes or fiddle with basis and value in real transactions are to be treated worse than people who are engaged in complete shams? Now, taking your client out of it, I'm talking now about congressional intent. Doesn't your line of analysis, as you've just described it, mean that a person is better off actually engaged in a complete sham transaction than in a legitimate transaction, one in which there's been some inflation of basis or value? We look at the penalty regimen, Your Honor. There's negligence. There's substantial understatement. There's valuation misstatement. Those three both carry at all. Three carry at 20%. It's the extreme 40% penalty that's the problem here. And our point, very simply, is in the transactions you described, I can't imagine someone coming up with a 400% inflation of the value in a regular transaction. And therefore, that person wouldn't be worse off than what's happened here. What were the actual numbers here? By virtue of having it be called economic sham, I mean a total sham, what was the additional tax that was due? Approximately $7 million, Your Honor. Okay. And then as a result of the penalty, how was that increased? The penalty is 40% of the 7, so it's $2.8 million. Okay. And interest runs on both of them. So the next point I want to make is Ms. Hagley seemed to say in her comments that the value should be equivalent of cost of $1.8 million. Again, there are rules of basis and value is not the limitation of basis. What's wrong with that reasoning? If the basis is not going to be zero, what would the basis be if not what Mr. Crispin actually got? $1.8 million worth of francs. Blackletter law says it is the cash plus any liabilities assumed in connection with the acquisition of property. So, I mean, what would the basis be? I believe it would be something like... $1.4 million? Significantly more than $1.4 million. Yeah, but I mean the point very simply is there are times in life when the value of property is greater or less than the basis and this is one of them. And it was a real loan that was expected to be repaid over 30 years and was in fact repaid. My light is on here, Your Honor. There's one point I want to make about this not doing the credit package and so forth on Mr. Crispin's part. Actually, two points. Number one, Mr. Boyle left in April. There was no one to deal with and the evidence showed Zurich was shutting down all of its non-core business including these cards transactions. I guess the second point very simply is this. You and I don't just go to a credit committee. We deal with a representative of a bank and we want a loan. That was what Mr. Boyle's position was for Mr. Crispin. It wasn't appropriate for him a year before the transaction to go to the credit committee and say here's what I want to do. Banks do not commit themselves to loans a year in advance. But if his intent was to do what he says it was, isn't it curious that he put it in the mortgage security company? That he didn't start a new company and say this is my intent and we're going to call it trans-air leasing? His work with the mortgage security company was ended, Judge Rondell, and it was a matter of what am I going to do with the money here? And the cash in that company plus the financing he was going to get was going to finance the plans. Thank you very much.